MANNING CURTIS BRADSHAW
  & BEDNAR LLC
Brent V. Manning (2075)
Chad R. Derum (9452)
Third Floor Newhouse Building
10 Exchange Place
Salt Lake City, Utah 84111
Telephone: (801) 363-5678
Facsimile: (801) 364-5678

Attorneys for Loram Maintenance of Way, Inc.

FILED
U.S. DISTRICT COURT

2006 JAN 24  A 11: 57

DISTRICT OF UTAH

BY: _____
    DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT

### CENTRAL DIVISION, DISTRICT OF UTAH

| | |
|---|---|
| UNION PACIFIC RAILROAD COMPANY, a Delaware corporation,<br><br>    Plaintiff,<br><br>- vs-<br><br>LORAM MAINTENANCE OF WAY, INC., a Minnesota corporation,<br><br>    Defendant. | **LORAM MAINTENANCE OF WAY, INC.'S COMBINED REPLY MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO COMPEL AND MEMORANDUM IN OPPOSITION TO UNION PACIFIC RAILROAD COMPANY'S MOTION FOR PROTECTIVE ORDER**<br><br>**Civil No.  2:04CV00271**<br><br>**Judge Tena Campbell**<br>**Magistrate Judge David O. Nuffer** |

Defendant Loram Maintenance of Way, Inc. ("Loram"), hereby respectfully submits the

following Combined Reply Memorandum in Support of Defendant's Motion to Compel and

Memorandum in Opposition to Union Pacific Railroad Company's Motion for Protective Order.

## INTRODUCTION AND FACTUAL OVERVIEW

Union Pacific ("UP") is suing Loram for indemnification of the $250,000 it spent to settle the negligence claim its employee, Robert Helmick ("Helmick"), filed against it. The Court has already ruled that, under the parties' contract, UP is not entitled to indemnification to the extent UP's negligence caused Helmick's injuries. In an effort to uncover the reasons UP settled with Helmick, Loram served discovery requests on UP seeking all documents relating to, *inter alia*: UP's investigation of the accident that caused Helmick's injuries, UP's analysis of Helmick's claims, UP's evaluation of contributory-negligence issues, and all documents concerning UP's decision to settle Helmick's claims (including those UP's attorneys and claims representatives created). While UP has made a limited production of a few documents, it has refused to produce others, claiming that the requested documents were protected under the attorney-client privilege and work-product doctrines.

The Court should now compel UP to produce the requested documents. UP waived its attorney-client privileges and attorney work-product protections when it filed suit against Loram, designated its attorney in the underlying action, Steven E. Napper ("Mr. Napper"), to testify as an expert witness in this suit and designated its other attorney in the underlying action, Alice M. de Stitger ("Ms. de Stitger"), to testify as its 30(b)(6) designee. Under Utah law, a party waives the attorney-client privilege when it puts protected communications "at the heart"of the case, such as where it designates its attorney from an underlying action to be an expert witness in a related suit.

UP cannot be permitted to use the attorney-client privilege to arm itself with the "sword" of knowledge of UP's attorney-client communications while also using the privilege to "shield" Loram from examining communications and work-product that may undermine the expert's opinions. If the rule were otherwise, Loram could never obtain the information necessary to defend against UP's

claim and effectively cross-examine UP's witnesses, including Mr. Napper and Ms. de Stitger. To the extent information about UP's liability determinations, track safety investigations, and "risk management" decisions are exclusively within UP's control, Loram has no alternative but to seek these privileged documents from UP. Without such information, Loram's defense of this action is crippled completely because Loram is left with nothing but UP's attorneys' self-serving conclusions about the case.

Moreover, while UP's Motion for a Protective Order does not raise any new legal issues, it has jeopardized the parties' deposition schedule. Loram filed its Motion to Compel on December 1, 2005. Thereafter, UP sought, and Loram agreed to extend the deadline for UP's response to Loram's Motion to Compel until January 16, 2006. At the time Loram agreed to that extension, however, UP never represented that it planned to file a Motion for a Protective Order, that it planned to seek *in camera* review of the documents at issue, or that it would seek a hearing on Loram's Motion. Rather, the parties agreed that when the briefing was complete on Loram's Motion that the parties would agree to file a Motion for Expedited Review with the Court so that the parties could obtain a ruling on Loram's Motion in advance of the depositions of UP's witnesses with information about the requested documents. [*See* December 16, 2005 Letter from Chad R. Derum to Jeffrey Devashrayee, attached hereto as Exhibit A]. In reliance on UP's representations about the timing for resolution of Loram's Motion, Loram made travel arrangements for its counsel and expert for the depositions. These depositions are set for February 7th and 8th in Denver, Colorado.

The documents Loram's Motion seeks are tied inextricably with the February depositions of UP's witnesses. Loram has identified Steven E. Napper, *its Senior Counsel and attorney in the underlying action between UP and Helmick*, as its expert witness to defend the reasonableness of

UP's decision to settle with Helmick.  [*See* Union Pacific Railroad Company's Disclosure of Expert Testimony, attached hereto as Exhibit B].  Mr. Napper is set to be deposed February 7th.  Mr. Napper's report offers UP's one-sided explanation for the reasonableness of the Helmick settlement. [*See* Expert Report of Steven E. Napper, attached hereto as Exhibit C]. As set forth in the Argument section below, the documents contained in UP's Privilege Log are essential to the effective cross-examination of Mr. Napper.

Additionally, many of the documents Loram seeks on UP's Privilege Log were created or reviewed by Alice M. de Stitger, also a UP attorney involved in settling Helmick's claim.  UP has identified Ms. de Stitger as its 30(b)(6) designee in this matter and Loram has served a 30(b)(6) Notice on UP that inquires into a number of areas that necessarily delve into privileged communications.  [*See* 30(b)(6) Notice of Union Pacific Railroad Company, attached hereto as Exhibit D].  Ms. de Stitger is also to be deposed on February 7th.  Loram will be unable to examine Ms. de Stitger effectively without all of the privileged documents requested in Loram's Motion.

Finally, UP's request for an *in camera* review of the Privilege Log documents is pointless here.  An *in camera* review would only help the Court determine whether the documents are, in fact, privileged, an issue Loram does not dispute.  Reviewing the documents *in camera* does nothing to address the issue here: to wit, whether UP **waived** the attorney-client privilege.  UP's proposed *in camera* review would do nothing more than put the Court in the impossible position of determining whether or how the privileged documents fit into Loram's case.

## RESPONSE TO UP'S FACTUAL BACKGROUND

For purposes of resolution of the present Motions only, Loram does not dispute the facts as set forth in paragraphs 1-14 of the "Factual Background" section in UP's brief.  However, Loram does dispute the remaining allegations in UP's fact section:

- In **Paragraph 15**, UP alleges that UP responded to Loram's discovery requests in "good faith" by producing the case evaluation of its lawyer, Steven E. Napper, "notwithstanding its privileged nature." [*See* Exhibit D to UP's Memo].  That document, however, also refers to an April 19, 2002 memorandum that UP's claims representative, Jim Eisele, prepared for or addressed to Mr. Napper in the underlying Helmick case.  UP has not produced that April 2002 memorandum and it does not appear on UP's Privilege Log.  Loram recently requested that UP produce this document and UP has not done so.  [*See* January 13, 2006 Letter from Chad R. Derum to Jeffrey Devashrayee, attached hereto as Exhibit E].  This April 2002 memorandum is responsive to Request Nos. 4-8 in Loram's First Set of Discovery Requests and should be produced.

- In **Paragraph 16,** UP states that it will produce the non-privileged documents reflecting communications between UP's attorneys and its retained expert, Max Ferguson.  These documents have not been produced.  For the reasons set forth in the Argument section below, any attorney comments should not be redacted from these communications.

- In **Paragraph 17,** UP states that it is producing a March 3, 2003 email from Ms. de Stitger to "another UPRR attorney."  That attorney is Mr. Napper, UP's expert witness in this case.  UP's designation of Mr. Napper puts at issue UP's otherwise privileged attorney-client communications.

- In **Paragraph 18,** UP states that it "has not used any of the documents withheld on

v

privilege or relevancy grounds" to advance its claims against Loram. This is false. UP's privileged communications have indisputably informed Mr. Napper's knowledge of the facts of this case. Moreover, UP's selective disclosure of privileged documents makes clear UP's intent to use such communications either offensively or defensively, or both.

## ARGUMENT

## I.   UP HAS WAIVED ANY ATTORNEY-CLIENT PRIVILEGE THAT MAY APPLY TO THE DOCUMENTS ON ITS PRIVILEGE LOG.

UP waived the protections of the attorney-client privilege when it placed at issue the contents of attorney-client communications and attorney work-product. Under Utah law, "[A] party may . . . waive the privilege by placing attorney-client communications at the heart of a case, as where a party raises the defense of good faith reliance on advice of counsel." *Doe v. Maret*, 984 P.2d 980, 983 (Utah 1999). While the court in *Frontier Refining Co. v. Gorman-Rupp Co.*, 136 F.3d 695 (10th Cir. 1998) noted that there are different approaches for determining whether attorney-client privilege has been waived, the Court need not guess what rule of decision the Utah Supreme Court would apply here. As shown below, Loram is entitled to discovery of the alleged privileged material under any standard.

### A.   UP's Designation of Its Attorney, as an Expert Witness Puts the Attorney-Client Communication "At Issue."

UP put "at issue" its attorney's communications regarding Helmick's claim when it produced an expert report prepared by Steven E. Napper, *UP's attorney* in the underlying Helmick action. [*See* Loram Memorandum in Support of Motion to Compel at 7]. *In Doe, the Utah Supreme Court recognized that identification of an attorney as an expert witness waives the attorney-client privilege.* To support its rule that waiver exists where privileged communications are "at the heart" of a case, the court relied on *Multiform Dessicants, Inc. v. Stanhope Prods., Co., Inc.*, 930 F.Supp. 45, 48-49 (W.D.N.Y. 1996). In *Multiform*, a party sought to compel disclosure of certain attorney communications in a patent-infringement suit. The party opposing the motion had identified its attorney in the underlying patent prosecution as its expert witness in the infringement suit. In

1

granting the motion to compel, the court held that a party "who designates its attorney . . . as its expert witness to testify at trial . . . has waived any attorney-client privilege or work-product protection from disclosure of information pertaining to the subject matter of the expert's opinion." *Id.* at 47. This is because "the deliberate injection of the advice of counsel into a case waives the attorney-client privilege as to communications and documents relating to the advice." *Id.* In light of *Doe* and *Multiform*, the Court need not try to predict whether the Utah Supreme Court would agree that UP has waived the attorney-client privilege; it has already so ruled.

In any event, Loram still prevails even if the Court engages in the *Frontier* court's analysis. In *Frontier*, an action for implied indemnity, Gorman-Rupp sought discovery of Frontier's privileged communications arising from Frontier's settlement of the underlying personal injury suit. Denying Gorman-Rupp's motion, the court applied the three-part waiver test in *Hearn v. Rhay*, 69 F.R.D. 574, 581 (E.D. Wash. 1975), and held that filing suit alone was insufficient to abrogate the privilege where the information sought was available from other sources. *Frontier*, 136 F.R.D. at 701-705.

As in *Frontier*, UP concedes the only issue here under *Hearn* is whether denial of access to privileged communications would "den[y] [Loram] access to information vital to its defense." *Frontier*, 136 F.R.D. at 701. In *Dion v. Nationwide Mutual Ins. Co.*, 185 F.R.D. 288 (D. Mont. 1998), however, the court held the attorney-client privilege was waived under *Hearn* where, as here, ***an attorney was designated as an expert witness.*** The plaintiff in *Dion* sought to discover certain privileged documents her insurer prepared in connection with a claim of bad-faith denial of underinsured motorist coverage. *Id.* at 291. The insurer claimed the documents were privileged. *Id.* To defend against the bad-faith claim, the insurer designated the attorney in the underlying coverage dispute ***as an expert witness.*** *Id.* Noting that the attorney-client privilege "***was intended***

*as a shield, not a sword*," the *Dion* court held that the identification of an attorney as an expert witness puts the privileged information at issue, depriving the Plaintiff of information *vital* to its defense, satisfying the *Hearn* test. *Id.* at 795. Observing that "when confidential communications are made a material issue in the judicial proceeding, fairness demands treating the defense as a waiver of the privilege," the court held that identification of the attorney as an expert witness constituted an *implied waiver* of the attorney-client privilege:

> [I]rrespective of the legal defenses Nationwide expects to raise, [plaintiff's] case will perforce place at issue [the attorney's] handling of the underlying claim. *To permit Nationwide to offer [the attorney's] conclusions and expert opinions regarding the underlying claim, where such conclusions and opinions serve Nationwide's purposes, without permitting [plaintiff] access to all the communications between [the attorney] and Nationwide would unduly prejudice Dion in the prosecution of the present action.*

*Id.* at 295-296. Thus, the *Dion* court properly required disclosure of otherwise privileged attorney-client communications and granted the motion to compel. *See also Squealer Feeds v. Pickering*, 530 N.W.2d 678, 685 (Iowa 1995) (holding that insurer's designation of its attorney as an expert witness "does constitute an implied waiver of the attorney-client privilege.").

As in *Dion*, UP's designation of Mr. Napper as an expert witness and Ms. de Stitger as its 30(b)(6) designee places UP's attorney-client communications squarely "at the heart" of this case. Mr. Napper's expert report (attached hereto as Exhibit C) opines about several issues that directly impute UP's attorney-client communications, including: 1) "the reasonableness of the settlement" in the underlying Helmick action; 2) whether UP had liability exposure to Helmick due to its negligence and whether "Union Pacific had potential liability to Mr. Helmick;" 3) the physical condition of the track where Helmick was injured; 4) the fact that Helmick could get his case to the jury if there was any evidence of UP's negligence; 5) the possibility that UP's failure to adhere to its

3

track safety standards may have contributed to Helmick's injury;[1] 6) the possibilities of what "a jury would probably find" with respect to the origin and severity of Helmick's injuries; 7) the size of a potential jury verdict based only on the selective facts disclosed in his expert report; and 8) the fact that the decision to settle the Helmick action was one of "risk management." [Ex. C, Napper Report at 2-3]. The 30(b)(6) Notice Loram served on UP inquires into similarly privileged areas. [*See* Ex. D, 30(b)(6) Notice].

Thus, all of the communications within UP's legal department concerning the potential settlement of Helmick's claim are "at issue" here. Loram should not be required to take at face value UP's appraisal of the value of Helmick's claim without evaluating UP's internal communications on this subject. *See Dion*, 185 F.R.D. at 295 (holding that "[a] defendant may not use the privilege to prejudice his opponent's case or to disclose some selected communications *for self-serving purposes*."); *Friction Div. Prods. v. E.I. Dupont de Nemours*, 117 F.R.D. 535, 538 (D. Del. 1987) (holding that where an insurer makes factual assertions in defense of a claim which incorporate, expressly or implicitly the advice and judgment of its counsel, it cannot deny an opposing party "an opportunity to uncover the foundation for those assertions in order to contradict them.").

Indeed, it would be virtually impossible for UP to defend this action without relying upon UP's internal analysis of "the basis for its liability, its liability analysis, and the reasonableness of the settlement." *Conoco, Inc. v. Boh Bros. Constr. Co.*, 191 F.R.D. 107, 118 (D. La. 1998) (requiring disclosure of privileged documents in indemnity action where party seeking indemnity placed its

---

[1]In determining whether UP has waived the attorney-client privilege, the Court should be mindful of the special circumstances of a FELA action. Under FELA, a jury's verdict against a railroad will stand even though the evidence of the railroad's negligence is of the "slightest" form. *Davis v. National R. Passenger Corp.*, 1991 U.S. App. LEXIS 28452 (4th Cir. 1991). Thus, UP's incentive for concealing privileged documents that may suggest a basis for its liability, however slight, is particularly high.

liability analysis at issue). Plainly, the truth of UP's "risk management" decisions may only be known when the entire spectre of UP's liability analysis is known, and not only UP's selective, self-serving assertions. Mr. Napper and Ms. de Stitger's knowledge of the case did not arise out of a vacuum; they will necessarily draw on privileged communications to support their testimony.

**B.    The Information Loram Seeks is Not Available from Other Sources.**

UP's defense that it need not disclose its privileged documents because substantially similar information is available from other sources fails easily. In *Frontier*, the court held that the veil of privilege could not be pierced because the information was available elsewhere and Frontier had done nothing to put the privileged communication at issue. *Frontier*, 1363 F.3d at 704. As shown in the preceding section, however, UP has injected into this case UP's conclusion that it had potential liability to Helmick, its analysis of the application of the governing track safety standards to its conduct, its speculations about what a jury would "probably" find with respect to Mr. Helmick's injuries, and its determination that settling Helmick's claim was a "risk management" decision, even though "[UP] was not negligent." [Exhibit C, Napper Report at 2-3]. The only party with information about these specific matters is UP. The veracity of every witnesses' testimony about UP's settlement can only be tested effectively when the documents UP created contemporaneously with the actual underlying suit have been disclosed. Otherwise, Loram is left with nothing but UP's sanitized, *post hoc* embellishments about the reasonableness of its settlement with Helmick.

UP suggests that, under *Frontier*, Loram should look to UP's employees, and Mr. Helmick's attorney for information about UP's decision to settle the case. Plainly, absent a ruling in Loram's favor on this Motion, UP may simply assert the attorney-client privilege during a deposition and instruct any UP witness not to disclose information concerning privileged communications. With

respect to Mr. Helmick's lawyer, his testimony plainly raises attorney-client privilege issues *vis a vis* Mr. Helmick . Moreover, his testimony offers no insight about the alleged "risk management" basis for the Helmick settlement or any information about UP's internal investigation of its potential liability.

Finally, UP's claim that it has already provided "two separate case evaluations" that "capsulize any subordinate information contained in the withheld documents" is insufficient. UP's disclosure of the case evaluations demonstrates only that the thoughts of UP's attorneys are relevant to this litigation, and the potential for UP to wield these assessments as a "sword." At best, these case assessments reflect on UP's *valuation* of Helmick's claims. None of these case evaluations address UP's investigation into the safety of the track where Helmick was hurt. It is UP's *liability analysis* as it relates to the valuation of Helmick's claim, that is critical here. Loram cannot look elsewhere for this analysis. It is in UP's exclusive control.

## II.   UP HAS WAIVED ANY WORK-PRODUCT PROTECTION.

UP's defense of its work-product protections also fails easily. Rule 26(b)(3) of the Federal Rules of Civil Procedure prevents discovery of an attorney's work-product unless (1) the discovering party can demonstrate substantial need for the material and (2) the discovering party is unable to obtain the substantial equivalent of the material by other means without undue hardship. *Frontier Refining, Inc. v. Gorman-Rupp Co., Inc.*, 136 F.3d 695, 704 (10th Cir. 1998) (*quoting* Fed.R.Civ.P. 26(b)(3)). Moreover, the protections of the work-product doctrine may be waived where a party puts its work-product directly at issue in the case. In *United States v. Nobles*, 422 U.S. 225 (1975), the Supreme Court held that where the party claiming the work-product protection called its own investigator to testify concerning statements certain witnesses had made before trial, that party could

"no more advance the work-product doctrine to sustain a unilateral testimonial use of work-product materials than he could elect to testify in his own behalf and thereafter assert his Fifth Amendment privilege to resist cross-examination on matters reasonably related to those brought out in direct examination." *Id.* at 240.  As shown below, UP has waived the protections of the work-product doctrine under both Rule 26(b)(3) and *Nobles*.

### A.    Loram Has a Compelling Need for the Privileged Documents Because UP Is Using Work-Product as Both a "Sword and a Shield."

UP plainly intends to use its attorneys' opinions and work-product to advance its claims against Loram, and Loram has a compelling need to discover this information.  The *Frontier* court recognized that "a litigant cannot use the work-product doctrine as both a ***sword and a shield*** by selectively using the privileged documents to prove a point, but then invoking the privilege to prevent an opponent from challenging the assertion." *Frontier,* 136 F.3d at 704.  Although the *Frontier* court did not find a waiver of the work-product protection because Frontier had merely filed an indemnity suit against Gorman-Rupp and thus "did not use the work-product as a sword," *Frontier* differs dramatically from this case.

Unlike in *Frontier*, a party that designates its attorney as an expert witness unquestionably wields "work-product as a sword."  In *Dion v. Nationwide Mut. Ins. Co.*, 185 F.R.D. 288, 293 (D. Mont. 1998), the court held that although Rule 26(b)(3) generally protects "the mental impressions, conclusions, opinions or legal theories of an attorney," the ***opinion work-product*** of Nationwide's agents were "clearly discoverable," because Nationwide named its attorney in the underlying case as an expert witness. *Id.* at 293.  Applying the Supreme Court's rationale in *Nobles*, the court held that the plaintiff had ***"a particularized and compelling need to discover [the attorney's] opinion work-product***.  Without said discovery, [plaintiff] will be unable to ascertain the basis and facts upon

7

which [the attorney's] opinions are based and, as a result, her ability for effective cross-examination *on crucial issues will undoubtedly be impaired."* *Id.* at 293 *[emphasis added]*. On this basis, the court granted the plaintiff's motion to compel disclosure of all attorney opinion work-product contained in the insurer's claims file because the attorney's "mental impressions [were] directly at issue" and the need for disclosure of the material was "compelling." *Id.* at 292. Indeed, because the processing of a claim *"is almost entirely an internal operation and [the insurer's] claims file reflects a unique, contemporaneous record of the handling of the claim. . . . [T]he need for such information "is not only substantial, but overwhelming." Id.* [emphasis added].

As in *Dion*, UP's designation of Mr. Napper to defend the reasonableness of its decision to settle with Helmick eviscerates the application of the Tenth Circuit's *Frontier* ruling and waives protection *for both fact and opinion work-product* under Rule 26(b)(3).[2]  Unlike in *Frontier*, UP has done more than merely file suit against Loram: rather, it has identified its lawyer as its "expert" to defend the propriety of the Helmick settlement. It has also designated its other lawyer, Ms. de Stitger, as its 30(b)(6) designee.   Thus, under 26(b)(3), Loram has a compelling, if not overwhelming, need to review all of the materials that UP's lawyers prepared that are relevant to that settlement. Consistent with *Nobles*, the Court must not allow UP to arm itself with the "sword" of "selectively using the privileged documents to prove a point, while invoking the privilege" to prevent Loram from challenging UP's conclusions.[3]  *Frontier*, 136 F.3d at 704.   Without access to the

---

[2] UP's distinction between "fact" and "opinion" work-product is unimportant here because UP has waived the more rigorous protections of opinion work-product. *Frontier*, 136 F.3d at 704, n.12 (disclosure of opinion work-product not required where a less rigorous standard for fact opinion work-product not met).

[3] The fact that Mr. Napper's expert report does not identify any privileged documents as the basis for his opinion merely shows how sharp UP's "sword" really is in this case. Mr. Napper's knowledge of the case did not arise out of a vacuum and UP cannot "shield" its work-product from disclosure simply by

privileged information, the examinations of Mr. Napper and Ms. de Stitger "will undoubtedly be impaired." *Dion,* 185 F.R.D. at 293.

### B. Loram Has No Alternative to Discovery of All of UP's Privileged Documents.

Loram also satisfies Rule 26(b)(3)'s requirement that the "substantial equivalent of the material" sought cannot be obtained by other means without " undue hardship." *See Frontier* 136 F.3d at 704 (*quoting* Fed.R.Civ.P. 26(b)(3)). In *Frontier,* the Tenth Circuit prohibited discovery of the opinion work-product because "information regarding the reasons for and reasonableness of the settlement was available elsewhere." 136 F.3d at 705. Here, however, UP's designation of Mr. Napper as its expert "clearly signals [UP's] intent to make offensive or defensive use" of UP's work-product. *Vaughn Furniture Co. v. Featureline Mfg., Inc.,* 156 F.R.D. 123, 128 (D.N.C. 1994). Thus, no "substantial equivalent" to UP's work-product exists because only UP knows what offensive and defensive information exists. Accordingly, all of the documents that UP's lawyer reviewed "at any time" that are relevant to the formulation of his expert opinion are discoverable. *Id.* These include "opinion documents" such as those "discussing trial strategy, even if the opinions were rejected as a basis for the expert opinion." *Vaughn,* 156 F.R.D. at 128.

As set forth in Section I, no other source exists from which documents imputing Mr. Napper's legal opinions could be obtained. Neither Mr. Helmick's counsel nor UP's non-attorney witnesses could provide information about the ultimate rationale for settling Helmick's claims. The only source available for testing Mr. Napper's opinions are the documents his legal department created during the Helmick action. UP put these documents at issue when it identified Mr. Napper as its

---

asserting that Mr. Napper did not rely on any privileged documents when he drafted a self-serving expert report defending his client's decision to settle Helmick's claim. "[I]rrespective of the legal defenses [UP] expects to raise," UP's suit "will perforce place at issue [Mr. Napper's] handling of the underlying claim." *Dion,* 185 F.R.D. at 295.

expert and Ms. de Stitger as its 30(b)(6) designee.

### III.   THE COURT SHOULD REJECT UP'S RELEVANCY ARGUMENTS AND REQUEST FOR *IN CAMERA* REVIEW.

UP argues that because it considers some of the documents on the Privilege Log not to be relevant, that these documents should not be produced.  Plainly, because Loram has not had the opportunity to review these documents, Loram need not accept UP's representation that they are not relevant.  It is well-settled that relevancy at the discovery stage is broadly construed.  To the extent the attorney-client and work-product privileges have been waived, Loram is entitled to review these documents to the same extent Loram is entitled to review all other non-privileged documents within the scope of its discovery requests.

The Court also should reject UP's call for an *in camera* review of the documents in the Privilege Log.  Depositions of the critical witnesses who prepared and reviewed most of the documents in the Privilege Log, including Mr. Napper and Ms. de Stitger, are set for February 7th and 8th.  UP should not undermine the scheduling of these depositions by shifting to the Court the time-consuming responsibility of conducting an *in camera* review.  An *in camera* review is also useless here because *it would not assist the Court in determining the critical issue of whether UP has waived* its privileges.  Rather, it would merely put the Court in the untenable position of determining whether or how the documents may be useful for Loram's case; an inappropriate outcome.

## CONCLUSION

For the foregoing reasons, the Court should grant Loram's Motion to Compel and deny UP's

Motion for a Protective Order.  Pursuant to Rule 37 of the Federal Rules of Civil Procedure, the

Court should award UP its attorneys fees in connection with these Motions.


DATED this ___24ᵗʰ___ day of ___January___, 2006.


                              MANNING CURTIS BRADSHAW
                                & BEDNAR LLC


                              _____
                              Brent V. Manning
                              Chad R. Derum
                              Attorneys for Loram Maintenance of Way, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that I caused to be delivered, via the method indicated below, a true and correct copy of the foregoing **LORAM MAINTENANCE OF WAY, INC.'S COMBINED REPLY MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO COMPEL AND MEMORANDUM IN OPPOSITION TO UNION PACIFIC RAILROAD COMPANY'S MOTION FOR PROTECTIVE ORDER** this _24th_ day of _January_ 2006, to the following:

| | |
|---|---|
| ✓ Hand Delivery | Jeffrey J. Devashrayee |
| ___ U.S. Mail | 280 South 400 West |
| ___ Overnight Mail | Salt Lake City, UT 84101 |
| ___ Fax Transmission | Attorney for Union Pacific Railroad Company |
| ___ E-mail Transmission | |



MANNING
CURTIS
BRADSHAW&
BEDNAR LLC
**A T T O R N E Y S**

Third Floor Newhouse Building
10 Exchange Place
Salt Lake City, Utah 84111
(801) 363-5678
Facsimile: (801) 364-5678
**www.mc2b.com**
Chad R. Derum
cderum@mc2b.com

December 16, 2005

*VIA FACSIMILE & U.S. MAIL*

Jeffery J. Devashrayee
280 South 400 West
Salt Lake City, UT 84101-1151

      Re:    *Union Pacific Railroad Company v. Loram Maintenance of Way, Inc.*
              *Civil No.  2:04CV00271*

Dear Jeff:

      I am writing to memorialize our conversation of this morning concerning several issues in the above-referenced matter.  First, we agreed that the depositions of the UP witnesses identified in my December 7, 2005 letter could be moved to February.  I indicated that these depositions will need to take place with sufficient time for Loram to conduct follow up discovery.  You indicated that you would not oppose either additional written discovery or the noticing of additional depositions as needed.  However, we affirmed that the parties have no intention of changing the existing trial date in this case.

      I will follow up with Loram's expert, Alan Blackwell, to find dates he is available to be deposed in February.

      With respect to Loram's Motion to Compel, we agreed that UP has until January 16, 2005 to file its opposition memorandum.  When briefing is completed, we agreed that both sides will file a stipulated motion for expedited review of the Motion to Compel with Judge Nuffer.  Assuming the result of that Motion is favorable to Loram, we expect UP to make a good faith effort to produce the required documents prior to any February depositions.

      Finally, on a housekeeping note, you indicated that you would expedite the drafting of a revised Scheduling Order to reflect the amended discovery dates you agreed to with Sean Monson.  Please forward that Scheduling Order to me at your earliest convenience.

                      Very truly yours,

                      Chad R. Derum

CRD/jcc

cc:   Dan Donoghue

**Exhibit**

**A**

Jeffery J. Devashrayee, #6209
Union Pacific Railroad Company
280 South 400 West, #250
Salt Lake City, Utah  84101
Telephone:  (801) 212-3985
Facsimile:  (801) 212-3978

Attorney for Union Pacific Railroad Company

---

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNION PACIFIC RAILROAD COMPANY, a Delaware corporation,<br><br>Plaintiff,<br><br>vs.<br><br>LORAM MAINTENANCE OF WAY INC., a Minnesota corporation,<br><br>Defendant. | UNION PACIFIC RAILROAD COMPANY'S DISCLOSURE OF EXPERT TESTIMONY<br><br><br>Civil No.  2:04CV00271<br>Judge Tena Campbell |

Pursuant to Court order and Rule 26(a)(2), Federal Rules of Civil Procedure, Defendant Union Pacific Railroad Company ("UPRR") hereby discloses the testimonies of the following expert witnesses who may testify in the above-captioned case:

1.      Steven A. Napper, Senior Trial Counsel, UPRR, 1331 Seventeenth Street, Denver, Colorado 80202.  Mr. Napper will testify consistent with his report attached hereto.  Also attached hereto is Mr. Napper's curriculum vitae.

**EXHIBIT**

**B**

2.    Max A. Ferguson, P.E., 3454 Wood Acres Boulevard, Duluth, Georgia 30096-313.

Mr. Ferguson will testify consistent with his report attached hereto.  Also attached hereto are Mr.

Ferguson's curriculum vitae, compensation schedule and list of prior testimony.

DATED this 12th day of August, 2005.


_____
Jeffery J. Devashrayee
Attorney for UPRR

2

## CERTIFICATE OF SERVICE

I hereby certify that on the 12th day of August, 2005, a true, correct and complete copy of

the foregoing was delivered upon the following attorneys in the following manner indicated below:

Brent V. Manning                                      __X__  U.S. Mail
Sean A. Monson                                        _____  Hand Delivered
Manning, Curtis, Bradshaw & Bednar LLC                _____  Overnight
10 Exchange Place, Suite 300                          __X__  Facsimile
Salt Lake City, UT  84111                             _____  No Service

_Jeffry J. Brundwyn_

3



Steven E. Napper
Senior Trial Counsel, Law Department

August 11, 2005

<u>VIA OVERNIGHT COURIER</u>
801.212.3985

Jeffery Devashrayee, Esq.
General Attorney
Union Pacific Railroad Company
280 South 400 West
Salt Lake City, UT 84101

  Re: *Robert Helmick v. Union Pacific Railroad Company*

Dear Jeff:

  You have asked me to provide my opinion regarding the reasonableness of the settlement in the case of *Robert Helmick v. Union Pacific*, Case No. 02CV4256, filed in the District Court for the City and County of Denver.  The case settled on April 25, 2003, for $250,000.

  I have reviewed the following documents in arriving at my opinion:

1. The Complaint and Request for Jury Trial.

2. The report of Plaintiff's economist, Jeffrey Opp, dated 12/9/02.

3. The various reports and depositions of Alan Blackwell, including the preliminary report, his deposition of 12/3/02, and his supplemental report dated 1/24/03.

4. The report of Max Ferguson to Alice de Stigter of 1/13/03.

5. Various medical records, including:

 (1) Dr. Jeffrey Kleiner, a report of a lumbar CT scan dated 1/11/01 and diskogram report of 1/11/01;

 (2) reports of Dr. Stephen Dinenberg;

 (3) the office notes of Dr. T.J. Friedlein;

 (4) Functional Capacity Evaluations done by Company Care in Kearney, Nebraska, on 9/27/01 and 10/24/01;

 (5) An emergency room report by Dr. Meyer, dated 10/30/00.



**EXHIBIT**

**C**

Jeffery Devashrayee, Esq.
August 11, 2005
Page 2

Based upon my review of these documents, as well as my experience as a FELA defense counsel in Denver since 1979, in my opinion, the settlement with Mr. Helmick in the amount of $250,000 was reasonable. I based my opinion on the following:

1.     Union Pacific had potential liability to Mr. Helmick. He testified in his deposition that as he stepped off the Loram rail grinder at approximately 4 p.m. on October 12, 2000, the ballast gave way and shifted under his foot. He claims this caused him to twist, and that he felt a sharp stabbing pain in the middle lower portion of his back. Mr. Helmick reported the incident the same day. Plaintiff's liability expert, Alan Blackwell, would have testified that we violated our own engineering standards and regulations regarding track structures. Additionally, he claims that we violated Federal Railway Administration regulations located at 49 C.F.R., § 213.103(b), which requires the ballast to support and restrain the track. The test for submission of an FELA case to a jury is whether there is any evidence that the alleged act or omission played any part, **no matter how small**, in actually bringing about or causing the injury. *See Rogers v. Missouri Pac. Co.*, 352 U.S. 500 (1957).

2.     In the second claim for relief in the Complaint, Plaintiff alleged a violation of FRA regulations. They supported this with the testimony of Mr. Blackwell. The risk is that if the jury believed we violated 49 C.F.R., § 213.103(b), we would be strictly liable, even though we were not negligent. *See Crane v. Cedar Rapids & I.C.R. Co.*, 395 U.S. 164 (1969); *Grogg v. Mo. Pac. R.R. Co.* 841 F.2d 210 (8th Cir. 1988). If the jury found we violated this regulation, we would get no reduction of damages for any contributory negligence of Mr. Helmick. *See* 45 U.S.C., §§ 53 & 54(a).

3.     A jury would probably find that Mr. Helmick injured his back while working for the Union Pacific on October 12, 2000. There are several reasons for this. First, Mr. Helmick reported it the same day. Second, we had no history of prior ongoing back problems. Third, even our independent medical examiner, Dr. Dinenberg, indicated that he felt there was a causal relationship between the twist of Mr. Helmick's back while working and the onset of back and leg symptoms. While it is true he had preexisting degenerative conditions, this is different from the clinical presentation of symptoms. Simply put, prior to this incident, Mr. Helmick was working without problems. After it, he had back problems, including significant surgery, and could no longer work for the Railroad.

4.     We would not be able to argue Mr. Helmick failed to mitigate his damages because he made a good-faith effort to return to work. Mr. Helmick would be perceived by a jury as having made a good-faith effort to return to work. He attended physical therapy and then work-hardening at Company Care in Kearney, Nebraska. At the request of Jim Eisele, he underwent two Functional Capacity Evaluations. In both of those, he had negative Waddell's signs. As a result of his evaluation, permanent restrictions from Union Pacific's medical director's office were put in place. Based on these restrictions, his supervisors said they were unable to accommodate them, and he could not return to work on any maintenance of way crew.

Jeffery Devashrayee, Es.,
August 11, 2005
Page 3

5.      Mr. Helmick's date of birth was April 5, 1959.  He began working for the
Railroad on January 19, 1998.  His likely retirement date would be at age 66; i.e., 2026.  In
his economic report, Mr. Opp estimated the past and future wage loss to be approximately
1.3 million dollars, including fringe benefits.  There is no offset for alternative earnings.  In his
deposition, Mr. Helmick indicated he thought he could return to work as an over-the-road
truck driver earning approximately $40,000 a year.  If we were to assume that Mr. Helmick
could earn this until age 66, and deduct income taxes, we would have an offset of
approximately $720,000, leaving a net wage loss of approximately $580,000.

6.      By the time this case went to trial, Plaintiff would probably argue that his wage
loss is even greater than $580,000.  His "treating physician" was Dr. Jeffrey Kleiner.
Plaintiffs' FELA lawyers had their clients referred to Dr. Kleiner on a regular basis.  Based on
my knowledge and experience with Dr. Kleiner, he probably would have testified that given
the fusion that Mr. Helmick had, Mr. Helmick would not be able to work until 66 as an over-
the-road truck driver.  This would increase Mr. Helmick's future wage loss.

7.      Mr. Helmick was a good worker for the limited time he worked for us.  He had
gotten promoted relatively quickly.  No one would come in and criticize his work ethic.  This
would make a favorable impression upon the jury and make Mr. Helmick a more deserving
Plaintiff.

8.      Based on my experience, juries in Denver start out with a belief that if a person
has been a good worker and is legitimately hurt on the job, they are entitled to some
compensation.  They tend to see the plaintiff as deserving, and are also influenced by what I
call a "Workmen's Compensation" mentality.  They typically come from a job where they are
automatically entitled to compensation if they are hurt on the job.  Given that Helmick was a
likeable person and a reliable and hard worker who suffered an injury on the job, a jury would
want, and look for a justification, to compensate him.

9.      The decision to settle a case is one of risk management.  The risk to the Union
Pacific was present.  Union Pacific could be found liable even though it was not negligent.
Mr. Helmick would have made a claim for $600,000, if not more, in wage loss, plus pain and
suffering.  When you can settle a case for 30% to 40% of the potential economic loss when
you can be found liable even in the absence of negligence, it is reasonable to do so.  There
certainly would have been a possibility of a defense verdict in favor of the Union Pacific.
However, that is just one factor to be considered in making the determination to settle.
Excluding frivolous cases, all cases have some settlement value.  When all of the above

Jeffery Devashrayee, Esq.
August 11, 2005
Page 4


factors are taken into account, particularly that Union Pacific could be found liable even if it were not negligent, the settlement of this case for $250,000 was reasonable.

Very truly yours,

Steven E. Napper

SEN/rg

*CURRICULUM VITAE*

STEVEN E. NAPPER
UNIION PACIFIC RAILROAD COMPANY
1331 17TH STREET, SUITE 406
DENVER, CO 80202
303.964.4579

## EDUCATION

1970 Bachelor of Arts
University of Michigan (with Honors and Distinction in History)

1973 JD
University of Michigan *Cum Laude*

## BAR ADMISSIONS

1973 Michigan
1974 Court of Military Appeals
1978 Colorado, U.S. District Court for Colorado, and 10th Circuit Court of Appeals

## EXPERIENCE

January 1974 – January 1978
    Captain, United States Army Judge Advocate General. Duties included: Post Judge Advocate Second Brigade First Army Division, Erlangen, Germany, advising Command on legal matters and prosecuting court martials; defense counsel; appellate defense counsel.

February 1978 – November 1978
    Associate at Sullivan & Leavitt, Northville, Michigan. Handled civil litigation.

March 1979 – October 1982
    Associate at Grant, McHendrie, Haines & Crouse. Assisted in and independently handled a variety of civil litigation, including title insurance defense, breach of contract, Federal Employers Liability Act, and railroad crossing accident cases.

October 1982 – July 1983
    Associate at William Myrick & Associates, a plaintiff's personal injury firm. Handled a variety of civil litigation.

August 1983 – Present
    In-house counsel Denver & Rio Grande Western Railroad, Southern Pacific Transportation Co., and Union Pacific Railroad Company. As in-house counsel for the Railroad, handled various legal matters, primarily those in litigation. Cases include Federal Employers Liability Act, railroad grade crossing accidents, EEOC, breach of contract and freight claims.

MANNING CURTIS BRADSHAW
   & BEDNAR LLC
Brent V. Manning (2075)
Chad R. Derum (9452)
Third Floor Newhouse Building
10 Exchange Place
Salt Lake City, Utah 84111
Telephone:  (801) 363-5678
Facsimile:  (801) 364-5678

Attorneys for Loram Maintenance of Way, Inc.

IN THE UNITED STATES DISTRICT COURT

CENTRAL DIVISION, DISTRICT OF UTAH

| | |
|---|---|
| UNION PACIFIC RAILROAD COMPANY, a Delaware corporation, <br><br> Plaintiff, <br><br> - vs- <br><br> LORAM MAINTENANCE OF WAY, INC., a Minnesota corporation, <br><br> Defendant. | **LORAM MAINTENANCE OF WAY, INC.'S AMENDED NOTICE OF RULE 30(b)(6) EXAMINATION OF UNION PACIFIC RAILROAD COMPANY** <br><br> **Civil No.  2:04CV00271** <br><br> **Judge Tena Campbell** |

PLEASE TAKE NOTICE that pursuant to Rules 26, 30 and 36 of the Federal Rules of

Civil Procedure Defendant Loram Maintenance of Way, Inc. ("Loram") will take the deposition

of Union Pacific Railroad Company beginning at 8:30 a.m. on Tuesday, February 7, 2006, and

continuing from day to day until completed, at the offices of Union Pacific Railroad, 1331 17th

Street, Denver, Colorado 80202.  Said deposition will be conducted under oath before a certified

shorthand reporter.

EXHIBIT

D

Pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, UP shall designate and produce one or more officers, directors, managing agents, employees or other persons to testify on behalf of UP with respect to the following:

1.     Any and all investigations concerning the Accident whether done internally by UP or by a third party, either private or government.

2.     UP's analysis of the claims asserted by Robert Helmick in the Helmick Action including, but not limited to, UP's potential liability to Helmick.

3.     UP's analysis of defenses to claims asserted by Helmick in the Helmick Action including, but not limited to, the defense that Helmick contributed to his own injury.

4.     UP's decision to settle the Helmick Action.

5.     UP's safety procedures, plans or practices, whether written or oral, in place since 1997, regarding UP's work with rail grinding or other rail maintenance contractors.

6.     UP's answers to Loram's First Set of Interrogatories.

7.     UP's answers to Loram's First and Second Set of Requests for Production of Documents.

8.     The documents UP has produced to Loram in this action, including the foundation of all UP documents produced.

9.     UP's suspension of on-ground train inspections in and around North Platte, Nebraska at any time after the Accident.

10.     Any report made to the FRA concerning the Accident and any request by UP for inspection of the track where the Accident occurred and the results of any such inspection.

11.     UP's investigation into Robert Helmick's personal background, if any, in

connection with UP's decision to settle Helmick's lawsuit.

12.    UP's knowledge of the number of ballast-related accidents on UP tracks in Nebraska during the 10 year period prior to Helmick's accident.

13.    UP's observance of FRA and/or UP's internal track safety standards at the accident site.

14.    The most recent track maintenance records for the area at or near the accident site prior to the accident .

15.    UP's decision to tender Helmick's claim to Loram.

16.    UP's actions regarding the treatment of Helmick's injuries in the one-month period following the Accident.

17.    The contents of the file(s) maintained by UP's legal department in the Helmick action.

The term "Accident" shall mean the incident on October 12, 2000 in which Union Pacific employee Robert Helmick was injured which is the basis for the Helmick Action.

The term "Helmick Action" shall mean the lawsuit filed by Robert Helmick against Union Pacific in Colorado State Court on or about May 30, 2002

DATED this 18th day of January, 2006.

MANNING CURTIS BRADSHAW
& BEDNAR LLC

Brent V. Manning
Chad R. Derum
Attorneys for Defendant,
    Loram Maintenance of Way, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that I caused to be delivered, via the method indicated below, a true and correct copy of the foregoing **LORAM MAINTENANCE OF WAY, INC.'S AMENDED NOTICE OF RULE 30(b)(6) EXAMINATION OF UNION PACIFIC RAILROAD COMPANY** this ___ day of January, 2006, to the following:


___ Hand Delivery                    Jeffrey J. Devashrayee
_✓_ U.S. Mail                        280 South 400 West
___ Overnight Mail                   Salt Lake City, UT 84101
___ Fax Transmission



MANNING
CURTIS
BRADSHAW&
BEDNARLLC

**A T T O R N E Y S**

Third Floor Newhouse Building
10 Exchange Place
Salt Lake City, Utah 84111
(801) 363-5678
Facsimile: (801) 364-5678
**www.mc2b.com**

Chad R. Derum
cderum@mc2b.com

January 13, 2006

*VIA FACSIMILE & U.S. MAIL*

Jeffery J. Devashrayee
280 South 400 West
Salt Lake City, UT 84101-1151

Re:     *Union Pacific Railroad Company v. Loram Maintenance of Way, Inc.*
        Civil No.  2:04CV00271

Dear Jeff:

        To follow up on our conversation yesterday, Loram respectfully declines UP's offer to resolve Loram's Motion to Compel through UP's production of four of the thirty-five documents contained in UP's privilege log.  Loram continues to believe that the law requires UP to produce all of the requested documents.

        Furthermore, in our conversation yesterday you referenced the July 15, 2002 Memorandum from Steve Napper to Jim Eisele that UP previously produced in this litigation. That document refers to an April 19, 2002 memorandum that Mr. Eisele prepared for or addressed to Mr. Napper in the underlying Helmick case.  UP has not produced that April 2002 memo and I did not see it on your privilege log.  I believe Loram is entitled to see this document pursuant to the discovery requests that are the subject of the above-referenced Motion to Compel. As the document was not listed on the UP privilege log, please produce this document to Loram at your earliest convenience.

                        Very truly yours,

                        Chad R. Derum

CRD/jcc

cc:    Dan R. Donoghue

**EXHIBIT**

**E**